UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) | CASE NO. 21-sw-516 -KLM<br><br>**Filed Under Restriction** |

APPLICATION OF THE UNITED STATES

FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel, respectfully submits under restriction from public access this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require Google, Inc. an electronic communications service and remote computing service located in Mountain View, California, to disclose certain records and other information pertaining to larryprt@gmail.com, larryprt1@gmail.com, lpr7mm@gmail.com, and biancafiniziorudolph@gmail.com (collective, the "Accounts"), as described in Part I of Attachment A. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

LEGAL BACKGROUND

1. Google, Inc. is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require Google, Inc. to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2); 18 U.S.C. § 2703(c)(1).

2. This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i). As set forth below, one of the offenses being investigated is a foreign murder in violation of 18 U.S.C §§ 1119, which has extraterritorial reach. *See United States v. Brimager*, 123 F. Supp. 3d 1246, 1250 (S.D. Cal. 2015) (citing *United States v. King*, 552 F.2d 833 (9th Cir. 1976). In such a situation, where there is extraterritorial jurisdiction and the crime is therefore completed outside the territorial jurisdiction of any state, the Constitution gives Congress the authority to designate the place for trial, U.S. Const. Art. III, § 2, cl. 3, and Congress has done so in 18 U.S.C.§ 3238. Prior to trial, any court in the United States would have "jurisdiction over the offense being investigated." *Cf. United States v. Bowman*, 260 U.S. 94, 98-101 (1922) (concluding that U.S. District Court for Southern District of New York had jurisdiction over an offense committed on either the high seas or in Brazil); *United States v. Slatten*, 865 F.3d 767, 783 (D.C. Cir. 2017) (jurisdiction over offense committed in Iraq by defendants who lived in many states); United *States v. Neff*, 212 F.2d 297, 301 (3d Cir. 1954) (noting broad power to grand jury to investigate even the predicate questions of jurisdiction).

3. A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are

reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## THE RELEVANT FACTS

4. The Federal Bureau of Investigation ("FBI") is investigating the death of Bianca Rudolph on October 11, 2016. Specifically, the FBI is looking to determine whether LAWRENCE RUDOLPH, BIANCA's husband at the time and the only other person in their hunting cabin, murdered Bianca in violation of 18 U.S.C. §§ 1119 and 1111 and then executed a scheme to defraud and to obtain money from life insurance companies by means of false and fraudulent pretenses, representations, and promises in violation of 18 U.S.C. §§ 1341 and 143.

5. On October 11, 2016, at approximately 5:30 a.m. local time, the RUDOLPHS were packing to leave their hunting camp in Kafue National Park, Zambia, when Bianca Rudolph was shot in the chest with the Browning shotgun. The Zambian Police Service was notified of the death and performed an investigation that included interviewing LAWRENCE RUDOLPH, PROFESSIONAL HUNTING GUIDE, whose identity is known to the FBI, and ZAMBIAN GAME SCOUT, whose identity is also known to the FBI.

6. LAWRENCE RUDOLPH told Zambian Police in sum and substance and in pertinent part that he was in the bathroom of their cabin and Bianca Rudolph was in the bedroom area when LAWRENCE heard a gunshot. LAWRENCE came out of the bathroom to find Bianca lying on the floor bleeding from the chest. LAWRENCE tried to resuscitate Bianca but was unsuccessful. LAWRENCE told the Zambian Police that he suspected the shotgun had been left loaded from the hunt the previous day and that the discharge occurred while she was trying to pack the shotgun into its pouch.

7. PROFESSIONAL HUNTING GUIDE told the Zambian Police that on the morning

of the death he was finishing up paperwork related to the hunt in the camp's dining hall. When he heard a gunshot from the cabin shared by the RUDOLPHS he rushed there with others, including ZAMBIAN GAME SCOUT, and found Bianca laying on the ground bleeding from the chest. LAWRENCE was shouting for help. PROFESSIONAL HUNTING GUIDE ran to get a medical kit and gave it to LAWRENCE, but LAWRENCE was unable to stop the bleeding. PROFESSIONAL HUNTING GUIDE recalled seeing the shotgun and an empty cartridge on the ground.

8. ZAMBIAN GAME SCOUT — a village game scout who had been escorting the RUDOLPHS during their hunt — told the Zambian Police that he was in the dining hall with PROFESSIONAL HUNTING GUIDE when he heard the gunshot from the cabin shared by the RUDOLPHS. When he heard it, he ran to the cabin with PROFESSIONAL HUNTING GUIDE and saw Bianca lying down with blood coming out of the left side of her chest. ZAMBIAN GAME SCOUT said he saw the gun laying near the door. ZAMBIAN GAME SCOUT saw LAWRENCE trying to lift Bianca up. ZAMBIAN GAME SCOUT said that BIANCA's body was taken outside and covered with a blanket.[1]

9. According to the investigation conducted by the Zambian Police, only one round was in the shotgun when Bianca Rudolph was shot, and the shotgun was in a soft gun case that was partially zipped when the gun was fired. Zambian police confiscated the shotgun in order to perform tests on the gun. ZAMBIAN BALLISTICS EXPERT, a Zambian Police Officer and

---

[1] No other witnesses reported the body being moved outside and later photos of the body taken by the Zambian Police Service show VICTIM's body inside the cabin. There are also other accounts from bystanders near the hunting cabin with statements that diverge in small respects from one another, including whether Bianca screamed around the same time the gunshot was heard.

Forensic Ballistics Expert whose identity is known to the FBI, stated he did a drop test with the shotgun from one and one and a half meters onto cement. ZAMBIAN BALLISTICS EXPERT stated the gun did not misfire during the tests. PROFESSIONAL HUNTING GUIDE was present when this gun was returned to LAWRENCE RUDOLPH.

10.   ZAMBIAN FORENSIC PATHOLOGIST, whose identity is known to the FBI, conducted an examination of Bianca Rudolph's body. The report he completed after the exam identified the Cause of Death as, "(a) Haemorrhagic shock (b) Macerated left side of heart and perforated lung (c) gunshot injury." The police report from Zambia states, "Findings further suggested that the firearm was loaded from the previous hunting activities and the Normal Safety Precautions at the time of packing the firearm were not taken into consideration causing the firearm to accidently fire."

11.   LAWRENCE RUDOLPH called the United States Embassy in Lusaka, Zambia, at approximately 4:30 p.m., Central African Time on October 11, 2016 and spoke with Consular Section Chief Otto Westhassel. Westhassel told the FBI, in sum and substance and in pertinent part that (1) RUDOLPH said the death was an accident and (2) RUDOLPH almost immediately began asking about how he could cremate the body. RUDOLPH later took steps to cremate Bianca Rudolph's body. However, before the cremation took place, Westhassel travelled to the funeral home to take photographs of the body. Westhassel, a former marine familiar with firearms and firearm injuries, did not see obvious gas burns or tissue expansion around the wound. He believed that the muzzle of the gun was two to two and a half meters away from Bianca when it was discharged and that it would not have been possible for Bianca to pull the trigger of the shotgun.

12.   Otto Westhassel met in person with LAWRENCE RUDOLPH at the funeral home

in Lusaka on October 14, 2016 before Bianca Rudolph's body was cremated. In sum and substance and in pertinent part, Westhassel told the FBI that during the meeting, RUDOLPH claimed not to know the type of firearm that had killed BIANCA. When asked what had happened, RUDOLPH told Westhassel that he had been in the shower at approximately 5:00 in the morning on October 11, 2016 while Bianca was packing to leave Zambia. He heard the discharge of the firearm and ran out of the shower, where he was joined by PROFESSIONAL HUNTING GUIDE.

13. Evidence gathered by the FBI shows that after Bianca Rudolph's death, LAWRENCE RUDOLPH received approximately $5,646,327.59 from life insurance policies payable to him upon BIANCA's death. Those policies were purchased at various times between 1987 and 2016. In approximately April 2016 a revocable trust was named as the beneficiary of those policies, with LAWRENCE RUDOLPH being the ultimate beneficiary of the trust. Among those claims was a claim for $1,000,000 from Great West Insurance Company, based in Colorado. On November 7, 2016 RUDOLPH faxed a notice of death to Great West in Denver, from Arizona. He also sent that same notice to Great West on or about that day via Federal Express. On or about December 16, 2016, RUDOLPH caused to be sent via Certified United States Mail a package of documents to Great West that included a certification that he had withheld no material facts from Great West and a report from the Zambian Police indicating that the death was an accident.

14. Witnesses interviewed by the FBI reported that prior to Bianca Rudolph's death, LAWRENCE RUDOLPH was having an affair with Lori Milliron. Another witness reported that Lori Milliron moved into the home RUDOLPH had previously shared with Bianca in approximately January 2017.

15.     ZAMBIAN BALLISTICS EXPERT identified the shotgun that killed Bianca Rudolph as a Browning Shotgun with serial number WT15100116.  The FBI acquired another shotgun from a private seller of the same make and model, along with a soft case matching the description of the soft case in the photographs from Zambia, and ammunition matching descriptions of the ammunition used in Zambia.  An FBI Special Agent then conducted testing to determine, by comparison to photographs from the scene of the death, the approximate position of the shotgun muzzle within the case and, at the shot patterns created by the shotgun, while inside its soft case, at various distances.  These patterns were then provided to an expert forensic medical examiner, who determined that the patterns most likely matching the wound scene in photographs of the body were created by shot from a distance of between 2 and 3.5 feet.  At that distance, there is reason to believe that Bianca Rudolph was not killed by an accidental discharge, as stated by LAWRENCE RUDOLPH.

16.     Evidence gathered by the FBI also provides reason to believe that the death was not the result of suicide.  Witnesses relayed that Bianca Rudolph had expressed excitement about attending her nephew's wedding, scheduled to take place after the hunting trip, on October 15, 2016.  Bianca was planning to host a large number of family members at her home in Arizona immediately after attending the wedding in New York, and she declined the opportunity to extend her hunting trip due to wedding-related commitments.  She had not otherwise expressed any suicidal thoughts.

17.     The email address biancarudolph@comcast.net was listed as a means of contact on the relevant life insurance policies related to LAWRENCE and Bianca Rudolph and was listed on life insurance documents by Bianca Rudolph while she was alive.  The address biancafiniziorudolph@gmail.com was used as a joint email address by Bianca and LAWRENCE

RUDOLPH in correspondence with their homeowners' association in Arizona. The email address larryprt@gmail.com was used by LAWRENCE RUDOLPH on an application with the South African Police Service for the import/export of a rifle and a shotgun in October 2014. The email address larryprt1@gmail.com was listed in the contact information for LAWRENCE RUDOLPH for American Airlines travel and a freqeunt flyer account in July 2016. LAWRENCE RUDOLPH also used the larryprt1@gmail.com account between July and September of 2017 to communicate with BIANCA's brother who was trying to obtain documents from LAWRENCE RUDOLPH related to BIANCA's death. The email address lpr7mm@gmail.com is associated with the LinkedIn account for Three Rivers Dental Group, the dental practice owned and operated by LAWRENCE RUDOLPH. The email address lawrence.rudolph@msn.com is associated with LAWRENCE RUDOLPH through checks of law enforcement databases. The email address lamilliron@yahoo.com was used by Lori Milliron with Southwest airlines in October 2016 and with American Airlines in 2017.

18. The requested records would establish patterns of communication by Bianca Rudolph, LAWRENCE RUDOLPH, and Lori Milliron prior to, during, and after the death on October 11, 2016, including patterns of communication with the relevant life insurance companies, overseas travel, and communications between LAWRENCE RUDOLPH and others about Bianca's death, as well as communications between Bianca Rudolph and others regarding the circumstances of her marriage. These patterns may identify other witnesses with information bearing on whether the death was intentional, the result of an accident, or suicide. The records may also establish whether any communications have been deleted and, if so, when. Such records would have evidentiary value separate and apart from any content because they would indicate possible efforts to obstruct an investigation.

19.     Based on these specific and articulable facts, the government respectfully submits that there are reasonable grounds to believe that records from Google, Inc.described in the respective attachments are relevant and material to an ongoing investigation.

REQUEST FOR ORDER

20.     The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the events described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that Google, Inc. be directed to produce all items described in Part II of Attachment A to the proposed Order within ten days of the service of the Order.

21.     The United States further requests that the Order require Google, Inc. not to notify any person, including the subscribers or customers of the account(s) listed in Part I of Attachment A, of the existence of the Order for a period of one year from the date of the Order. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.* In this case, such an order would be appropriate because the requested Order relates to an ongoing criminal investigation that is not public.  LAWRENCE RUDOLPH is aware of the investigation, as a result of having been notified by others who were questioned by the FBI. However, he is not aware of details of the investigation, including the FBI's interest in determining whether there is digital evidence related to possible motives for the crime.

Disclosing the orders and alerting others to the digital aspects of the investigation could cause RUDOLPH, Milliron or others to delete stored digital communications. Accordingly, there is reason to believe that notification of the existence of the requested Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. *See* 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers, in the cloud, or on telephones and other media devices. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers. Finally, LAWRENCE RUDOLPH frequently travels outside the United States. If given additional information about the progress of the investigation, he could flee outside the jurisdiction of the United States.

22.     The United States further requests that the Court order that this case, namely the application and any resulting order, be restricted from all public access until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation the details of which are neither public nor known to the target of the investigation. Accordingly, there is

. . . .

. . . .

. . . .

. . . .

23. good cause to restrict these documents from public access because their premature disclosure may seriously jeopardize that investigation.

> Respectfully submitted,
>
> MATTHEW T. KIRSCH
> ACTING UNITED STATES ATTORNEY
>
> *s/ Bryan Fields*
> Bryan Fields
> Assistant United States Attorney
> 1801 California Street, Suite 1600
> Denver, Colorado  80202
> Email: Bryan.Fields@usdoj.gov